We will hear argument first this morning in Case 2366, Trump v. New York. General Wall? Mr. Chief Justice, and may it please the Court, this case should be over. The District Court held that Apolles would be injured because illegal aliens would be chilled from participating in the enumeration, but that counting is now over, and whatever chill ever existed has thawed. Apolles therefore pivot to possible future injuries, but as of this very morning, career experts at the Census Bureau confirmed with me that they still don't know even roughly how many illegal aliens they'll be able to identify, let alone how their number and geographic concentration might affect apportionment. And if they don't know, certainly the other parties to this case do not. The Court therefore should follow the course charted by the pre-judged D.C. District Court last week, vacate the judgment below, allow the Secretary to comply with the memorandum, and allow any effect on apportionment to be litigated as it normally would be, in a post-apportionment lawsuit by parties with concrete injuries. On the merits, there's no procedural problem with the memorandum. The President may direct the Secretary to send in two sets of numbers so that he may decide how to exercise whatever discretion he has. The real fight here is substantive, over how much discretion the President has. Text, history, and precedent are all clear about the general test, whether one is an inhabitant. The question is how to apply that test to people who are present in the country illegally. Treating someone apprehended at the border on March 31st, or scheduled to be removed on April 2nd, as a usual or settled resident of the United States on April 1st, flies in the face of this Court's cases, common sense, and any sound theory of political representation. The President has at least some discretion to determine that at least some illegal aliens lack enduring ties to the states, which means that the judgment should be reversed. I welcome the Court's questions. General, my first question goes to the very first point you raised. We expedited this case in light of the December 31 deadline for the Secretary to transmit the census to the President. Is that date still operative? Do you still need a decision by that date? Well, the situation is fairly fluid, Mr. Chief Justice. Because of the two weeks that we lost to the California injunction and some subsequent issues in processing the data, we are not currently on pace to send the report to the President by the year-end statutory deadline. But, just this morning, I confirmed with senior leadership at the Department of Commerce and the Census Bureau that we are hopeful, and it remains possible, that we can get at least some of the PM-related data to the President in January, so we do still need relief from the Court, yes. Sounds like you had a busy morning. What do you mean, PM data? I'm sorry, the Presidential Memorandum data. So, the data the President has requested in order to potentially back out illegal aliens from the apportionment base. On the standing question, if the Court doesn't intervene now, before the Secretary transmits the information to the President, I don't know when the Court would be able to intervene. All that would be left after that transmittal is the transmittal by the President to the House. So, if the injury can't be redressed at this point, when could it be? In a post-apportionment lawsuit, just as in Franklin or Wisconsin or Utah v. Evans, if the Bureau is able to feasibly identify enough aliens, and the President excludes those categories, and that affects the apportionment, those are all three unknowns, but if that happens, then you have a post-apportionment challenge, just as in Franklin, for the Secretary to revise his report and for the President to send a new report to the House, in effect, to redo the apportionment. Well, isn't that going to be like having to unscramble the eggs? I mean, the apportionment, any change in any one state, of course, is going to have ripple effects all across the country, and it does seem like it would be more manageable at an earlier stage. Well, Mr. Chief Justice, I don't want to resist this too much, because we would prefer for the Courts to reach the merits and uphold the Presidential Memorandum. We just think, for the reasons given by the D.C. District Court last week, there are too many unknowns here. I take the point that there is a bit of an omelet to unscramble, but we do unscramble that in post-apportionment lawsuits, so it's possible to enter relief. And on the flip side, you could have the Court issuing an opinion on what the President may or may not do, only to discover days or weeks later that it's effectively advisory, because the numbers aren't large enough to affect the apportionment, and the appellees here and other potential appellees wouldn't be injured, either with respect to apportionment or funding. That strikes us as a fairly serious problem, either as a matter of Article III standing or prudential ripeness. General, just very quickly, should we assume that we're not going to be talking about all illegal aliens in the country, but some subset, some uncertain subset, like the ones in ICE detention? I think it is very fair to say, Mr. Chief Justice, that the President has not made a determination yet, because we don't know what's feasible, about excluding all illegal aliens, and has recognized that some subsets are going to be much stronger cases for the exercise of his discretion than other subsets. Thank you, General. Justice Thomas? Thank you, Mr. Chief Justice. General Wall, I'd like you just to discuss a bit, as you understand what Respondent is enjoying the President, because it's actually his decision that it seems that they're ultimately concerned about. I think that's a fair point, Justice Thomas, but the court crossed that bridge in Utah v. Evans, over a dissent by Justice Scalia, that the relief wasn't redressable, because relief couldn't run against the President. The court held in Utah, and no one has asked here that that decision be overruled, that it was fair that you could obviously enjoin the Secretary as a subordinate official, and that the judiciary would assume that the President would comply, and so too here. There's no reason to believe that the President would not comply with this court's judgment, either now or in a post-apportionment context. But in Utah, it's my understanding that that was actually the census, wasn't it? Yes, it was a challenge to certain procedures that were being used with respect to the census. It was, in effect, a sampling claim. Okay, but here we're talking about something separate from the census, or am I mistaken? No, I think that's the other side's argument, Justice Thomas. I think they have seized on the fact that we sometimes use the word census to refer to the counting, and said, aha, look, the Census Bureau came up with a final number, and the President essentially accepted that, but then sought to back out illegal aliens. And I don't think that's right. The Presidential Memorandum makes clear that he was exercising his authority under Franklin to determine the apportionment base after the counting. And so I don't think ... It is certainly our position that this is not somehow outside or stands apart from the census. Could you actually, though, get the exact same information in a memo that's from the Commerce Department or the Census Bureau that says this is not the Section 141 report, but here's what we think those numbers look like? The statutory scheme seems to contemplate that the President will rely on the Secretary's report in sending his submission to Congress. Now, Franklin says he's entitled to reform the data that the Secretary gives him, but I think it would be a much more difficult question if he tried to act entirely outside of the process that the statute set up. And obviously, here he hasn't done that. He's just exercised his authority under Franklin to tell the Secretary that he wants to look at different sets of numbers so that he can make a decision about the apportionment base. Well, it just seems to me that I don't understand why you couldn't get the exact ... The President couldn't get the exact same advice outside of the context of a formal report with separate numbers and then make his decision. But beyond that, the Chief Justice asked you about these subcategories or subsets of illegal aliens, but could you give us your idea of what the President means generically by illegal alien? He means people who are present in this country unlawfully, and that includes a number of different subsets. We've named several of them in our brief, which I think are the clearest cases for the exercise of the President's discretion, but there are a number of other subsets too. But the entire category is people who are present in this country in violation of federal law. Thank you, General Wall. Justice Breyer? Yes. Thank you. I was also concerned with what Justice Thomas brought up, and so to clear away some weeds from my mind, would you tell me where I missed this or if I'm right? We're looking at a statute, 141. A says the Secretary shall take a decennial census, okay? B says the tabulation of the population that he just took, as required for the apportionment of representatives, that tabulation shall be reported by the Secretary to the President. That's the report we're concerned about. That's the tabulation we're concerned about. And it is based on that, where you go to 2A, the President shall transmit a statement showing the whole number of persons for the purpose, again, of apportionment. So we're not interested in other ways. We're interested in this report, in this tabulation under 141B. Now if I'm right so far, the President's order says, I'll tell you why I want that. I want that because it's our policy that illegal aliens will not be included in the census. I can't say exactly what one is, it doesn't say that, it just says illegal aliens will not be included. And he asked for the report, so he can do that. Now if the Constitution forbids him to, or if the statutes forbid him to subtract from the tabulation for purposes of the statement, if it forbids him to subtract those illegal aliens, or to the extent it does, the tabulation and the report are not the tabulation required for the apportionment of the census. And therefore he cannot ask, he cannot ask the Secretary for that report to contain that information. Right or wrong? And if wrong, why? I think I agreed with you up to the very end, Justice Breyer. I think you correctly understand how these statutory provisions, which were passed together in 1929, work. And I think it's true that if the Constitution or the statutes constrain the President's ability to back them out, then that would mean that his statement, setting aside judicial review, his statement to Congress under 2AA would be unlawful. But I don't know that any of that is a constraint on his ability to simply request the information from the State. Well, it is not the information if it's unlawful, but it is required for the apportionment of the House of Representatives, because it is illegal. Now whether it's illegal or not is a different question. All we have on that is about 40 briefs that show that the history, the language, the consequences, the purposes, and a bunch of other things argue against you, that you have arguments against that. But if that side wins, then I don't see how the information he's requested could be the information required for the apportionment of Representatives, quoting the statute. I think all I would say, Justice Breyer, is I don't want to run together the procedural and the substantive issues. I think what you're really getting at is the substantive issue of what the President's powers are here, not any of the procedural issues that they've raised with respect to the memorandum. So I agree with you that what's really at issue here is that substantive question that you're focused on. Well, maybe, but we're not suing the President. They're not. They're suing the Secretary. And they're saying, Mr. Secretary, you cannot give to the President this requested information and also say that that piece of paper that you send him is the tabulation as required for the apportionment of Representatives. It may be something else, but it isn't that. And that's what he's asked you to do, and that's what you're trying to do. And Mr. Secretary, if it's illegal, you can't do it. That's right, Justice Breyer. My only point was, that doesn't have anything to do with their procedural arguments about the use of administrative records or whether this is somehow part of the census. No, it doesn't. That's all just their substantive claim that the President doesn't have the power to ask for it. Okay, okay. I mean, on that one, it says persons. This started in 1820, you know, and they've always counted people who were here and not naturalized. And this has never happened before, that you excluded the illegal aliens, and it has a lot of negative effects on the states. You know all those arguments, and I think they're fairly strong ones. Justice- I mean, what do you want to say? They're persons, aren't they? Briefly, Counsel? Just very briefly, Justice Breyer, there's two different things there. One is the historical practice, which I hope I'll be able to address later, because I think Franklin takes care of that. The other is the text and the history. None of that goes specifically to the question of illegal aliens. Justice Alito? General Wallace, if I can, I want to try to press you a little bit on some of the answers you gave to the Chief Justice, because I find the posture of this case quite frustrating. It could be that we are dealing with a possibility that is quite important. It could be that this is much ado about very little. It depends on what the Census Bureau and the Department of Commerce are able to do. If I just take the numbers from the District Court in D.C.'s opinion last week, they said that the plaintiffs in that case were claiming that there are 10.5 million people in this country who would be counted as being here illegally. But if you look at the smaller number of those who are held in detention facilities, it's something like 60,000. The first number could easily change the apportionment of representatives. The second one, it's much more doubtful that it would change the apportionment of representatives. There are only 31 days left in the year. To exclude the 10.5 million seems to me a monumental task to do that without sampling, to take 300 million plus names and determine individually for each of those people whether they are lawfully in the United States. I would think you would be able to tell us whether that remains a realistic possibility at this point. Can you not provide us with any more information than what you provided in your answer to the Chief Justice was that basically they're working on it? I can provide you with a little bit more. I don't know how satisfying it will be. But I think it is very unlikely that the Bureau will be able to identify all or substantially all illegal aliens present in the country, so anything like the 10 or 11 or 12 million numbers that are flying around. They will be able, I think, to do ICE facilities, which, as you say, is some number in the tens of thousands. The question is where it will fall in the middle, and we don't know. The reason we don't know is because it turns a great deal on the level of detail that we got in doing the enumeration, and until we actually take the census master file and these various administrative records, once they're all cleaned up and ready to go and we actually run the models in a few weeks or whenever it is, we won't actually know how many people we pick up. And so I pressed the Deputy Director of the Census Bureau on this very question, and the simple fact is that the experts don't know. They don't know whether it will be 50,000 or 100,000 or 500,000 or a million, so there's just substantial uncertainty. Well, before my time runs out, I have no expertise whatsoever in this area. I can understand if they say all we can determine is how many people are in detention facilities or subject to final orders of removal. If they're going for the bigger picture and trying to identify everybody who is in this country unlawfully, I don't see how they can provide a partial answer to that. If they were to say, well, you know, we've done this for 200 million people, but we don't know about the 100 million-plus additional people, there's no way an apportionment could be based on that, is there? They're trying to get the categories of illegal aliens that you could identify based on the kinds of records we have. So final orders of removal, for instance, or people who have been removed, who are found here again and haven't been given any lawful status. So it's not that we can pick up everyone. There will be some undetected illegal aliens who we aren't even attempting to screen for because they wouldn't be picked up, obviously, by any record. It's the categories that would be shown by some sort of record that we have. And the question is just how feasible is it going to be to capture large numbers within those categories? And, unfortunately, we don't know at this point. And it's a feature, by the way, though, I have to say, not of the government's conduct. It's a feature of the fact that Applebee's brought a pre-apportionment challenge on the basis of this injury that was always going to cease in the past. Justice Sotomayor? Justice Sotomayor? Yes. Mr. Wall, as I understand and read the memo, the President's memo, he says he intends to exclude every alien who does not have permission to be here in the United States. Now, yes, he limits this to where it's feasible to identify that. But right now his policy is if I can identify them, no matter what the reason is for them being an illegal alien, I'm going to exclude them from the census. Following up on Justice Alito's question, aren't those the very categories that you already say that we've been told there have been some of them who's in ICE is going to come by December 31st? And then by January 11th, the Census Bureau says that it intends to provide the President with the information, quote, necessary to fully implement the presidential memorandum. I'm quoting the Census Bureau. So if I take that at its face, it means that the number is not going to be 60,000. The number intended is substantially large. And I think that was Justice Alito's point, which is the Census Bureau has been collecting data about undocumented immigrants from any other agencies for over a year. I don't see how you can represent to us that you don't think it's going to be a substantial number. Three quick points, Justice Sotomayor. First, I don't think that's actually an accurate statement of the memorandum. You're certainly right that that's the policy, but there are two built-in limitations. One is whether it's feasible, and the second is whether the President decides that he has the legal discretion to exclude all of these subsets. And the subsets might have different legal analysis depending on the kind of ties they have or the type of status they have. Mr. Wall, I'm a little bit questioning of that for the following reason. The Census Bureau already defines what residency is, where you're living, as a snapshot date of April 1, 2020. Now, whether you're in a prison, in ICE detention, we're told by one of our Amici that 57% of the people in detention will eventually be released to the United States, either through asylum or through some other mechanism. So I am not sure how you can identify any class of immigrant that isn't living here in its traditional sense. But this is where they are. This is where they were on April 1, and where they intend to stay if they can find any way to do it. Thank you, Justice Sotomayor. Based on my understanding from the Census Bureau, there is a real prospect that the numbers will not affect the apportionment. But as I said earlier to the Chief Justice, I'm perfectly happy if the Court disagrees with us on that and disagrees with the analysis of the D.C. District Court last week and moves to the merits. Because we think on the merits, the Court should uphold the presidential memorandum, because at least some of the illegal aliens captured by the presidential memorandum don't satisfy the test for inhabitancy, either as a matter of the Constitution or the statutes. Well, what you're saying is the memo says, I think anyone, presidential memo says, I think anyone without papers should not be counted. Now you're saying, well, maybe the president will limit that subcategory. But that's not what he's asking for. He's asking for all of those illegal aliens that can be unidentified. And wouldn't Heller defeat this argument that we shouldn't rule? In Heller, we knew that there were certain people who states could legitimately bar from possessing guns in their homes. But we didn't say, because there's that subset, we're not going to declare what the general law is. So why shouldn't we do the same thing here? You can't exclude illegal aliens because they're undocumented. The Court would have to conclude in order to say that, as the District Court here did, that the president doesn't have the discretion to exclude any illegal aliens from the apportionment base, even some subset, because the injunction here prohibits him from getting any of the information he needs to exclude any subset. And he did make clear in the memorandum that although as a matter of policy he wanted to exclude the entire set, that he had not yet made a judgment on whether he had the legal discretion to do that for the entire class. Justice Kagan? General, I guess I'd like to keep going with the line of questioning that the Chief Justice and Justice Alito talked about as to what categories we're talking about. As I read you, you're saying, well, yes, there's this small category of ICE detainees. That seems pretty feasible, but that's just tens of thousands of people. So how about a few others? As I understand it, there are almost 200,000 persons who are subject to final orders of removal. Will the Bureau be able to report on those? It is working very hard to try to report on that subset, yes. Okay. There are 700,000 DACA recipients. Will the Bureau be able to report on those? It is working on that, too. We can't be certain at this point, and we don't know what the President will decide to do with respect to that set. Obviously, you have papers, all kinds of records on those people. So I would think that that sounds pretty feasible to me. But the problem is the matching, Justice Kagan, right? We have the administrative records. What we don't know is the number that participated in the census, either through questionnaires or other proxies, and that provided sufficient detail to do the matching. That's the problem here. Okay. How about the 3.2 million non-detained individuals in removal proceedings? It's the same thing. We have to have reliable information on them, and that information has to match up with what they've provided to the census. Okay. So what I'm getting from you is we can get very easily to 4 or 5 million people who you have extensive administrative records on, and you're saying, well, there's a matching problem. So I guess this goes back to Justice Alito's question. You're 30 days out. It seems to me you either know whether you can do matching or you don't know whether you can do matching. Why the uncertainty on this? Because until you actually compare the one set against the other set, you just don't know how many hits you get. But again, Justice Kagan, I'd love to move to the merits because if the court decides we're wrong and that this really is teed up constitutionally or prudentially, even though there may not be an effect on apportionment, I think that there are good reasons that we haven't yet talked about why the entire category of illegal aliens shouldn't be thought to qualify under the inhabitancy test. Can I ask you, before we go to the merits, Mr. Wall, how would a post-apportionment challenge of the kind you talked about earlier work? It seems to me that the time period, once it's post-apportionment, is very crunched. States have to do their own redistricting. How exactly does that work? What's the timeline on it? Well, here the timeline is even easier than a normal case because the district courts have already decided the merits. So I think this is going to move even more quickly than this round of litigation, which obviously only took a few months. But you bring the case, you get the order to the secretary to fix the report, and then the executive branch would have the option of seeking review in this court. That could all play itself out fairly quickly, I think. Fairly quickly? What do you think it would play itself out to? When would the end date be? I couldn't say, Justice Kagan, because it depends on when the report gets to the president, how quickly the district courts enter relief, and then the party that's agreed comes up to this court. But I would think a matter of a few months. Do you think that given that you're uncertain when the report will go to the president, this goes back to the Chief Justice's first question, that there's something to be said for not following the expedited procedures that you asked us to follow and just sort of keeping this around in a normal way and you could tell us whether expedition was necessary when you knew? I think the problem, Justice Kagan, is this is all fairly fast-moving, and if the court doesn't enter some kind of relief, we would face a real prospect that the secretary would never be able to send the report to the president, and the president then wouldn't be able to turn around and send a report to Congress. So, no, there's a lot of controversy between the parties in that sense, which is we want to be able to have the president exercise his power, and the injunction currently blocks us from doing that. It's just no longer founded on some injury to the appellees that is sufficient for standing or rightness purposes. Thank you, General. Justice Gorsuch? Good morning, Mr. Wall. I'd like just to press you a little bit further on what are the practical difficulties and likelihood of actually being able to do the matching process with respect to various categories? It seems like the one common ground is that the 10,000 or whatever number it is currently in ICE detention is something you think will happen. Beyond that, can you give us any sense of the difficulties or likelihoods? I can't, Justice Gorsuch. The Bureau is working very hard, but as I say, until they actually do the comparison, we just won't know how many identifications we're able to make and whether that stands to affect the apportionment. So is it a reasonable prospect to think that it would be limited to the number of persons currently in ICE detention? I think that's possible, but it is also very possible that they will be able to do more. As I say, we don't know at this point. I wish I could provide the court with more certainty. I can't. That's why we think that the court should vacate the judgment and not get into this. But if the court disagrees, as I say, I would love an opportunity to turn to the merits and talk about why I think they can't satisfy either half of the usual resident test, either the residency or the usual or settled requirement. I have a question in an entirely different direction. Your colleagues on the other side pointed in a footnote, I believe it was, in their briefs to the Federal Reports Elimination and Sunset Act in the 1990s, which looks like it may have well repealed Section 2. So are we arguing over the meaning of a statute that doesn't exist? I had hoped to get some response from the government on that in its reply brief, but I didn't see any. Perhaps I missed it. And what is the government's view about the status of Section 2? New York suggests, well, maybe it is repealed, but to the extent the government wishes to comply with the repealed statute, it has to follow the repealed statute's terms. That's one response. Another response is that the only thing repealed were reports and this is a statement. Does the government have any views on any of that? Yes. In our view, it's not an annual, semi-annual, or other periodic report covered by FERSA, the statement, which is why in 2001 and 2011 the executive branch sent over the statement and the House reapportioned as the statutes require. It's never been litigated. I'm not aware if we've even ever briefed it, but in our view there were various things on the clerk's list that I think clearly do not qualify as the type of report covered by FERSA, and in our view this statement under 2A subsection A is like those things. It's not a other periodic report. What do we do about the fact that it appears to be expressly referenced by statute? In the reports, the president continued the decennial census report, section 2A, right there listed. Sorry, just to be more clear, we don't think the language picked up everything on the clerk's list because there were things on the clerk's list that wouldn't qualify. It only picked up things on the clerk's list that qualify as an annual, semi-annual, or other periodic report. Periodic doesn't include every 10 years? We don't think the other periodic report picks up the statement, which there's a deadline under the statute, but it's not as if it has to go over at some set period or on a particular date every time. So we don't think that statement qualifies. Okay. If I were to disagree with you and think that every 10 years does appear to be a regular periodic report specified on a list, what then? I suppose there would have to be supplemental briefing from the party, Justice Gorsuch. It's not jurisdictional. Thank you, Mr. Wall. Justice Kavanaugh? Thank you, Chief Justice, and good morning, General Wall. You forcefully argue that there's too much uncertainty, that the dispute will become a concrete Article III controversy only after the President transmits the statement. But I want to button up some things on that to make sure we're on the same page and follow up a bit on what Justice Kagan was asking you. First of all, you're not saying, as to judicial review, not now, not ever. You're just saying not now, as I understand it. But as Justice Breyer indicated, the posture of this will change. After the President transmits the statement, and there's a question about injunctive relief against the President. So I think you're saying that we can assume, as the Court has before, that the President would comply by a declaratory judgment requiring him to transmit calculations that include those non-citizens living unlawfully within the country if we were to issue such an order after the President transmits the statement. Is that accurate? Yes. Okay. And your argument for waiting is based on uncertainty. Uncertainty, again, as Justice Kagan and the Chief Justice and Justice Alito were asking about the numbers. But one thing that was in the DDC opinion of Judge Katz, as joined by Judge Friedrich, was that it will be not possible to exclude all non-citizens living unlawfully in the country because that would require the use of sampling, is what the opinion said, and that the memorandum, the presidential memorandum, rules out the possibility of using an unlawful method. Is that accurate, or what's your response to that? We're not sampling. This is what I was trying to say to Justice Kagan earlier. We're taking the records from the administrative agencies, and we're taking the data given by individuals with respect to the census, and we're comparing them. We're literally trying to individually identify people who are present in the United States in violation of federal law. And because we are not sampling, and we are doing this fairly cumbersome matching process, it's just not clear what results we're going to get or whether it's going to affect the apportionment. Well, is it possible to exclude? Is it possible to get the information to exclude all non-citizens living unlawfully in the country, or is it possible only to get information as to subsets at this point? You may not know the answer to that. No, the latter. It is only possible the records will only cover a particular subset. Okay. So it's not possible to exclude all non-citizens living unlawfully in the country, correct? No. If you took somebody who crossed the border illegally, was undetected, and did not participate in the census, that person might not be found in any administrative record, and they wouldn't be on the other side of the ledger either because they didn't participate in the census. That person just would not be captured by this process, not even arguably. And then on the question of ripeness or standing, our doctrine, as I see it, parts of the ripeness inquiry are really similar, if not identical to parts of the standing inquiry. If you look at the phrasing in cases like Ohio Forestry on ripeness and cases like Susan B. Anthony on standing, the key point I think is that the memorandum imposes no obligations on the plaintiff. It doesn't impose anything at this point, unlike, for example, a typical agency regulation that might, say, impose some duties or requirements on the plaintiff, so we allow pre-enforcement challenges. We've called that lack of ripeness. We've called that no standing. Do you think it matters which we call it, and do you agree that the two inquiries overlap on that particular kind of analysis? Yes, there is substantial overlap. We've framed it as a constitutional matter because we don't think they satisfy the constitutional minima, but if you thought they got the toe over that line, then you'd get the same analysis, I think, as Judges Katsas and Friedrichs did as a matter of prudential ripeness. So I agree that there is a lot of overlap, and obviously under Steele Co. and Seneca, you can do prudential ripeness before the merits because it's a threshold doctrine, so nothing requires the court to do Article III rather than to do it as a constitutional matter. Justice Merritt? Good morning, General Wall. I'm going to let you talk about the merits for a minute here. As Justice Breyer said, a lot of the historical evidence and the longstanding practice really cuts against your position. There's evidence that in the founding era, an inhabitant was a dweller who lives or resides in a place. You do have this Vittel quote that defines an inhabitant as distinguished from a citizen, as a stranger, permitted to settle and stay in the country. Do you think that Vittel quote is your best evidence? Well, if you look only at the founding, I think the Vittel quote is good. I think Madison in Federalist 42, when he talks about a state allowing you to become an inhabitant, is fairly powerful. And what I say is, look, there isn't a lot of attention given to the specific question of illegal aliens for the first half of the country for obvious reasons. But the court does have to deal with the residence or dwelling question in other statutes. And the answer it consistently comes back with is, if you've entered illegally, you are not treated as if you're dwelling or residing here. You're treated as if you're stopped at the border. And the other side doesn't really have any answer to why those cases shouldn't equally apply here and say, look, if the test is usual or settled resident, you're not thought to be a resident. And even if you are, there's nothing usual or settled about your residence if your presence is violating federal law and the sovereign hasn't agreed to let you stay. But if an undocumented person has been in the country for, say, 20 years, even if illegally, as you say, why would such a person not have a settled residence here? So take long-term embassy personnel, so somebody who's worked at an embassy for 15 or 20 years, Justice Barrett. That person certainly has ties to the community, and yet we have excluded them in some past sentences because they're not the sort of ties just as with illegal aliens that amount to residence or dwelling or what Franklin calls allegiance or an enduring tie. And so to federal personnel overseas, they're not residing here. They may spend years at a time abroad, but we still think they have the kind of tie that counts here. And so I think I'm not disputing at all that illegal aliens form ties to the community in the sense you're talking about, but they're not the sort of ties that are sufficient to qualify you within the apportionment base because they don't count toward residence or dwelling within the meaning of these federal statutes. But you can see that illegal aliens have never been excluded as a category from the census. Well, yes, we have taken account of alienage in certain ways before, but yes, and that's the best argument on the other side. There is a historical practice, and if we didn't have Franklin, it could be tougher for us. But we know from Franklin that the fact that you've got a fairly unbroken practice doesn't necessarily mean it's constitutionally compelled. They need some evidence that that has to be the rule as a constitutional or statutory matter. And that's what they don't have. They have a bunch of historical evidence that the founders and the framers of the 14th Amendment didn't want to limit it to citizens or voters, completely agreed with all of that. But what they don't have is any evidence that they specifically wanted to include illegal aliens because they thought even if you came here in violation of the law, you were nevertheless an inhabitant. That's the very question that in other contexts the court has answered in the negative by saying you're not a resident. So it's just been an unexercised discretion all along. They could have been excluded from the census, and the fact that they had not been excluded before doesn't mean the President can't make the choice to do so now. So, too, in Franklin, Justice Barrett, but I guess I qualified a little bit. For the first half of the nation's history, the question doesn't come up because you don't have federal immigration restrictions. And for much of the second half, it doesn't matter nearly as much as it matters now. So, look, I'll certainly grant that no President has made this judgment before, no President's ever focused on it before. But I think in order to say, as in Franklin, that the President can't do this, he can't include there this federal overseas personnel, even though they hadn't been included for a host of censuses, they need to point to something in the text or the history that clearly mandates that they be included in the abortion debates. And that's every illegal alien. It's not only the ones you were talking about that have ties to the community. It's somebody who's apprehended at the border and in an ICE detention facility, sometimes only for a day or two, before being sent back to Mexico or the Northern Triangle. A minute to wrap up. General Wolfe? Thank you, Mr. Chief Justice. So just as I was saying earlier, we think that there are a handful of unknowns here. What it will be feasible for the Bureau to do, whether the President will decide to exclude all of the subsets that are feasible with a memorandum, clearly indicates that the President hasn't made that legal judgment. It's been a policy call, but not the legal judgment and the effect on apportionment. And as I said to Justice Kavanaugh, we don't think it matters whether the court labels that under article three or provincial rightness, but we're happy for the court to disagree and go to the merits because there is a fairly small window of time here for the court to decide the merits. On the merits, they can't satisfy either half of the test. They're not residents and there's nothing settled about their residents. And they've not offered any coherent theory of political representation, why all illegal aliens should be included in the apportionment base. For those reasons, if the court reaches the merits, we think it should reverse and uphold the memorandum. Thank you, General Wall. General Underwood? Mr. Chief Justice, and may it please the court. The constitution and laws require the seats in the house be apportioned according to the number of persons in each state. The President's new policy of refusing to count people who are not in the lawful immigration status is flatly inconsistent with that command. Our laws reflect the deliberate choice not to base apportionment on citizenship, voter eligibility, or any other legal status, but instead to count the number of people living in a state. That has always included people who are ineligible to vote, including noncitizens, and it has also included people who were present in violation of law. The memorandum treats counting people as a reward to be withheld from states that house undocumented immigrants. But our law views counting people for apportionment as finding facts, not giving and withholding rewards. The memorandum pretends that if under the law a person should not be here, then the person is not here. The government can do many things to induce undocumented immigrants to leave, but it cannot declare them to be gone when, in fact, they are here and likely to remain. My friend says the policy must be upheld because some undocumented immigrants could be excluded from the count. Whether they could is disputed, but in any case, that would not support this policy, which applies to all undocumented immigrants and refuses to count them solely on the basis of undocumented status. As this court recognized in Shelby County, an unlawful policy can't be saved by the possibility that a lawful policy could be written. The question here is whether a blanket policy of not counting undocumented immigrants is lawful, and it's not because undocumented status alone doesn't tell us where a person usually resides. This policy ignores the undisputed fact that millions of undocumented immigrants have lived here for decades and have substantial community ties. Their undocumented status doesn't erase their presence. General Underwood, could you tell me precisely what the relief is that you seek? An order from the court saying what? Well, an affirmance of the injunction below, which was to declare the policy invalid in violation of law and the constitution as well, but statute would do and an injunction against transmitting the information about undocumented persons as part of the report on which that's the precise issue. I want to focus on it. It seems to me that you're asking really for a gag order on the secretary of commerce concerning his communications to the president. Let's suppose that the secretary conducts the census and prepares the tabulation exactly as you would have it, and puts that in an envelope to send to the president, but also in a separate envelope puts information on the number of illegal aliens. And he sends both of those envelopes to the president. Is that fine with you? That does. Yes. That does not violate the injunction. There is no gag order to be placed on the secretary of commerce. He can be asked for and respond with all sorts of information, but the one 41, the particular statements and transmittals that are operative, they aren't just the transmission of information. They operate as steps in the apportionment. The president, I would assume, is then free to report to the Congress information for the apportionment. And he can do the math. He can take what the census that the secretary has transmitted, as you would have it, and subtract the number of illegal aliens or subcategories and use that information. Well, we are now at the point where if, if you issued a declaratory judgment saying that that policy is unlawful, and my friend on the other side has said, the president would comply with such a declaratory judgment. Then the answer is, well, he would have the information in principle. He could use it. He couldn't issue a report to Congress that was in violation of the constitution. Thank you. General justice Thomas. Thank you, Mr. Chief justice general under what I'm a little confused. The, did I understand you to say that if the census Bureau sent the information in a separate envelope, that would be fine. At least if it was a label, not the one section one 41 report. It would not. Yes. It would not violate the law. It would be a transmission of information. So what does that accomplish? Because I thought your, your major concern is the use of that information by the president. That's correct. The concern is that, and in the course of directing the secretary, not to transmit this as part of a report, this court would presumably also declare that the use of it was unlawful without enjoining the president, because there is that problem about injunctions against the president. So I'm trying to Europe. So I, your argument is that if it's sent separately, it can't be used in the apportionment. That's correct. It might be usable for many other things, but not as part of the apportionment. Thank you. Justice Breyer. Thank you. Underwood. I think, are there not many statutes which divide funds among the states on the basis of population? And then they say something like quote, as shown by the most recent dice annual census. And does that tie that to the one 41 B report? I think it does. Do you know any, are there not many instances where it does? There are many instances where the distribution of funds is top is, has to be derived from the census. I suppose we'd have an argument about whether we would argue that. If the information is used in the census and in the report that is sent to Congress, it also will have an effect on the distribution of funds. If the information is sent separately. That's not what I'm thinking of. I'm thinking of suppose this one 41 B report has both. The number of illegal immigrants, the illegal aliens, and also the total census. What do you use? I don't think it can have both. I know. I didn't think that was your theory. I thought that's the government's theory. Right. So what happens under their theory? Well, I don't know what happens under their theory. They have sometimes said that a transmission of two sets of numbers. Is all part of the one 41 B report. And they have sometimes said it's separate. And I don't know. Okay. If we both don't know, let, let us go to a different question, which is I'd like to know what you have to say about Franklin versus Massachusetts. Well, Franklin Massachusetts of course said that the secretary has, and the president has some discretion, but it's not unlimited discretion. Franklin recognized usual residents as the test and then treated overseas government workers like other situations, recognized that the founding people absent from the state where they have a residence and continuing ties and intend to return. They think of themselves as away from home and Franklin recognized that that situation was suitable for the exercise of executive discretion. There is no support. Justice Alito. Thank you. I have two questions that are important to me. I hope I'm going to be able to squeeze them both in, in my time. The first concerns, your answer that it would be fine for the secretary of commerce to submit numbers that exclude illegal aliens. If it was done in a separate document, once you can see that, unless you are asking us to overrule what Franklin said about the president's directing the secretary to reform the census, then I don't really understand where your argument is going. And suppose that suppose the tables were turned, suppose the president wanted to count every single person who was in the United States on census day, but the secretary of commerce took it upon himself to give the president numbers that excluded every illegal alien. Do you think the president would then be unable to direct the secretary of commerce? To comply with the theory that the president accepted. The president would under Franklin have the ability to direct a reformation of the census. There would be the same question, but it would be a different question. There's always the question with that reformation is constitutional or not. Yeah. Well, that goes to the substance of the, of the issue, which I do want to get to. But if the secretary, once you concede that two documents are possible and that the president can ask the secretary to reform the numbers that are sent to him, I don't understand why there isn't a, why, why the situation where both sets of figures are submitted in a single document is any different. It seems like a totally meaningless formality. It's not a meaningless formality in the sense that this is the moment. In the process, when judicial intervention can operate, the problem arises because once the president, because, because of the reluctance of the court to enjoy the president. So the injunction operates against the secretary and what he can transmit. And then the president. And in telling the secretary what he can put in those in the one 41 report, the court will also be telling the president what is lawful to use in his report to Congress. If I can move on to my second, my second point, I want to give you six categories of people and ask you to answer yes or no. To the extent you can, whether you think each of these people in each of these categories must be counted for apportionment purposes. First category is a foreign diplomat who was posted here for three years. No, because he's for several reasons because he's a tourist who's here on a valid visa. No. A tourist who overstays her visa and is therefore here illegally. Well, that person is now outside the realm of, we expect them to leave. And so that person is a resident like any other undocumented person. Justice Sotomayor. General. I see this as being very similar to Franklin, because I think you're arguing and I think the solicitor general agrees that the president has to use only the numbers that are given to him by the secretary. If the secretary gives him illegal numbers to exclude, then he can't use an outside report to exclude those people from the country. Is that correct? He cannot use, he can't do an illegal report. Yes. And he can't use a separate report. The tabulation has to provide him with the numbers that he uses. Correct. Correct. And so if it is illegal for him to exclude illegal aliens, sorry for, for, for that. Then we can do exactly what we said could be done previously, which is to order the secretary not to give the president illegal numbers. Correct. Correct. So that's your point, which is if he's going to tabulate and exclude illegal aliens, we have to decide as a matter of law, whether the word persons as used in the statute and constitution, who live here permits the exclusion of illegal aliens. Correct. That's the legal question. Correct. If he later decides that he wants a particular category of people to be excluded, who are illegal aliens, then he gives a memo to the census secretary earlier that says this category, I think should not be here for these reasons. And if the secretary says, I'll give you those numbers, then we would have an identical Franklin's decision where they could come in and sue and say to the secretary, no, you shouldn't permit those illegal aliens or yes, you should, whatever the answer is. Correct. Agreed. Yes. And that's, what's missing here, which is the president is asking to exclude give numbers on the category of illegal aliens that of any kind. And some of those numbers legitimately cannot be included. That's your argument. Correct. Yes. Justice Kagan. General Underwood, if I could take you back to the standing question, this is the way I understood what came out of general walls. You, the government has tons of records on tons of people. I mean, we're not just talking about ice detainees. By the time you think about DACA recipients and people in removal proceedings and a number of other categories, you easily get over 4 million people. But general wall says that that's not the problem. The problem is a matching problem. And essentially the, the department has not yet sort of gone through this process of trying to match those numbers with the answers to the census questionnaire. Now I don't really quite understand how that process works. So I'm wondering if you do, if you can tell me whether you think it's credible that they, the census Bureau at this point would not know approximately how many people they'll be able to exclude of all the people that they have administrative records on. And I guess the second question would be, is that what we should be focused on or is that an unimportant question? Well, I am not a master of the technology here. I do know that there is a process by which matching occurs. And I do not know, I cannot opine on how successful they will be. I can only say that what we have is a lot of evidence that they have a lot of numbers available, that they are working as hard as they can to do as much of this as they can, that subtracting just some of that 4 million or so from the count would be a seat away from one or more states. And that speculation at this point, what we have on this side of uncertainty is speculation. We have repeated representations from the census Bureau and the department of justice that, and that they are, they've been working on this since July, 2019. And they're now starting to tell us about the categories that they will be able to identify and match. And that if there turns out to be a problem, if there isn't enough here to be the basis for any judicial action, it's speculation that they won't be able to do it at this point. So it seems to me that it would make sense. It might make sense for this court to wait a couple of weeks and find out whether there's more information that would shed some light on this question. Justice Gorsuch. Good morning, Miss Underwood. If it is a matter of speculation, whether they're going to be able to include or exclude, why isn't that a standing problem or a rightness problem now? If we must rule now, they can't use statistical sampling. So they're going to have to match their detention records or their docket records against the actual enumeration in the census. And at the present, they tell us that they might not be able to do more than maybe the aliens and ice detention facilities, which would be in the tens of thousands and perhaps not affect any apportionment at all. Well, I think that they're not saying they're only going to be able to do ice detention. They're saying that that's a group they already know they'll be able to do and that they're working feverishly to do the same for other groups. And we know from the last round of census litigation, that they have the ability to do matching. Now I can't speak to the technology of it, but they were quite confident that they were going to be able to do matching. So it seems. But Miss Underwood, I guess my question is, you know, you can see that it's speculative as to how much they're going to be able to do. And once we've, once we're in that world, then it's speculative whether there's going to be any effect on the apportionment. And, and in that world, we have a standing problem, don't we? Well, I think that's not quite the world we're in. I think we have a substantial risk of injury, but all the evidence until very recently was that they were going to be able to do, to implement the presidential memorandum and that they are now just now saying that they're not sure how fully they're going to be able to do it. So I think that's a substantial risk of injury sufficient for article three standing. And I think there could be a, as a matter of prudence, some interest in waiting to get more information since they seem to also be saying there will be more information very soon. But I think we have article three standing for potential risk. Justice Kavanaugh. Thank you, chief justice and good morning and welcome general Underwood. As justice Barrett's questioning illuminated, I think you've advanced forceful constitutional and statutory arguments on the merits of a categorical exclusion of all unlawful non-citizens. But I'm not sure that's going to be the dispute. And so I want to explore that. If we said now, as you want us to say that the secretary and the president cannot exclude all non-citizens living here unlawfully, suppose we say that, and then the president excludes not all, but some subsets, then we'll be right back here with litigation. Correct? Well, I think that what you would have is you would have invalidated this policy. And he couldn't act. And the secretary couldn't act pursuant to this policy. I'm sorry to interrupt. Couldn't he then substitute a new policy consistent with the exclusion of all by saying, um, we're going to exclude some subsets and then there'll be litigation on that. We'll be right back here. Which is perhaps that, I mean, now we're doing, now we're speculating some more about what he might, might do. Um, well, I think it's, I'm sorry to interrupt, but I think the, um, solicitor general has indicated it's going to be very difficult, if not impossible to exclude all. And I guess I'm wondering then, it seems like part of this is, uh, and you, you've acknowledged this forthrightly is that the difficulty of an injunction against the president, if we wait to post apportionment, but or post transmission, uh, but, uh, the president we've assumed in the past would comply with a declaratory judgment. Uh, we've said that the solicitor general confirmed that today, uh, does, does that eliminate the problem that has forced or encouraged you to bring this litigation now? Well, it could mitigate it, but, um, even, I mean, a declaratory judgment action has to be addressed to somebody who, who can act. Um, I don't think you, we would, you would issue a declaratory judgment action against the president. And if the secretary has already done everything he's going to do, then it's not clear exactly who the appropriate recipient of that declaration is. Justice Barrett. Good morning. I have one question that's a followup to justice Cavanaugh's question, and that has to do with, um, the feasibility of counting all of these categories of illegal aliens. If as general wall said, the president and the secretary of commerce are only able to identify certain categories. And as justice Cavanaugh said, if that means that there would be litigation on a case by case basis about whether such categories should be in or out, doesn't that cut in favor of waiting that maybe there's no injury here because we're not really sure what the contours of the decision would be. Well, I think I should just, um, the idea that the categories are so small that they won't make a difference and that they would be litigated one by one. Um, I, I think that the policy that the president articulated is as many as possible. The memorandum while, while Mr. Wall said he was going to exercise, the president would exercise discretion after this information came in. The memo says to the maximum extent of the president's discretion. So the policy is clearly not to identify subcategories. It's to do as much as possible. And, um, the categories that are available are just going to be whatever they can find. Um, and I think this court can speak to that policy. Now, is it likely that they would come back with other new policies? Perhaps I don't think that would always be true. I don't think that's a reason not to decide the question that's here now. But what if, what if we say that he cannot categorically exclude all illegal aliens? He says, fine, I'm not going to do that. I'm going to count everyone who's in an ICE detention facility, everyone who's in removal proceedings, and maybe say all DACA recipients. But I agree. You know, I have reasons for thinking each of these don't satisfy the inhabitancy requirements. Wouldn't you just be back litigating those specific issues? Yes, I think we would. Yes. Okay. Thank you. My time's up. A minute to wrap up general Underwood. The constitution and laws provide that house seats should be allocated on the basis of total population. The framers wanted a system that could not easily be manipulated. So they decided to count just the persons living in each state.  They rejected that choice. People who live in a state without lawful immigration status still live there. They are not invisible. And like other residents voting and non-voting, their presence requires attention from the government and the need for representatives to give that attention. That is the rationale for one rationale for including them. The decision to refuse to count them has produced a live controversy from the moment it was announced to now this court should resolve the controversy and reject a policy that would refuse to count millions of people who have lived here for decades, have jobs, mortgages, families and community ties and reside in a state under any reasonable interpretation of those words. Thank you, general. Mr. Ho. Mr. Chief justice, it may please the court for 230 years, dating to the founding. States have always held seats in the house according to the number of persons in each state without regard to immigration status. Now with respect to standing, the test under Susan B. Anthony is whether there is a substantial risk of injury and past experience shows that it's easy to risk changing the apportionment in Utah versus Evans. According to the party summary, judgment briefs, the practice of imputation added a total of 32,000 people in North Carolina and 5,000 in Utah. And that difference was enough to shift one seat from the latter to the former. We know that the numbers here are much bigger as justice Kagan pointed out, the government has information on millions of undocumented immigrants. And one and a half years ago when the president issued an executive order in July of 2019, he stated that the government could already match citizenship records for 90% of the population. So there's substantial risk of injury now, and it would be better to resolve this issue now rather than in six months during the redistricting process, which could be disruptive. Mr. Ho, what is the problem with post apportionment litigation? Right now is the questions have shown. We don't know what the secretary is going to do. We don't know what the president is going to do. We don't know how many aliens will be excluded. We don't know what the effect of that will be on apportionment. All these questions would be resolved if we wait until the apportionment takes place. So why aren't we better advised to do that? Well, I think waiting a couple of weeks wouldn't be very disruptive, Mr. Chief justice, but the record establishes that there's at least a substantial risk of a shift in the apportionment now, which is enough for standing. And if the question is should the court wait now or send this back for another round of expedited proceedings, then there are many good reasons to decide this case. Now the government argued that waiting would deprive the nation of prompt notice of reapportionment as required by statute, and that it could be very disruptive to redistricting processes in a number of states. Waiting a couple of weeks isn't going to give us much more information than we have now. Waiting until apportionment will give us all that information that we, we don't have. Oh, I'm sorry, Mr. Chief justice. I did mean waiting the four weeks or so, maybe four and a half or five weeks, depending upon when the apportionment report is delivered to see what those numbers look like. I'd agree that that short of a wait wouldn't be disruptive, but if we're talking about sending this case back for additional proceedings in the district court, another expedited appeal and doing this all over again over a period of several months, then that would be, I think, disruptive to ongoing redistricting processes. Thank you, counsel. Justice Thomas. Yes. Thank you, Mr. Chief justice. Mr. If the additional information would be beneficial in a few weeks, wouldn't it be beneficial to actually resolving this case? That's the questioning seems, seems to suggest there's some difficulty in assessing exactly what information will be available and what that information will be. Well, justice Thomas, the challenge here is to a policy that broadly mandates the exclusion of undocumented immigrants to the maximum extent under law. And the government's position is that under law, all undocumented immigrants may be excluded as solicitor general wall noted. Their view is that the entire category of undocumented immigrants are not inhabited. So the court is presented with a facial challenge to a categorical policy. The government's been free to issue a narrower memorandum, excluding one or more subgroups as purported non-residents rather than taking aim at undocumented immigrants writ large. And it hasn't done that. It's the categorical policy that's at issue and it's unlawful. Well, I think it would be the, I think your argument would be that the implementation of a categorical policy would be unlawful. But what I'm hearing is that we don't exactly know which category or subcategory will be excluded. Well, as I take a solicitor general walls representations here, it's that the government will exclude to the maximum extent that's feasible. And that's permitted under law. And the government's view is that the entire category of undocumented immigrants may be excluded under law. Even if we take the government's three proposed subcategories of undocumented immigrants were supposedly per se excludable. Those categories are quite heterogeneous. They're overbroad. I don't think that they are all categorically non-inhabitants. Thank you, justice Breyer. Thank you. What do you think about excluding the lawfulness of excluding just the 50,000 or so who are in ICE centers or under final order to remove? Well, justice Breyer, the population of people in ICE detention, as I noted, is quite heterogeneous, even under the government's definition of inhabitants. Many of those people would qualify. You can be a lawful permanent resident and be in ICE detention, even a person who is detained at the border. That person can apply for asylum in some years, more than half of asylum. Suppose you do a change in slightly and say, we are going to exclude not count people who are under legal order to remove. Well, people under final orders of removal can actually reside in the country for quite a long time. They can petition for review to courts of appeals. They can seek other forms of relief. They can challenge their orders collaterally. Some are never actually deported, even after going through all of those processes because their home country. All right. So what line would you draw between those whom they could legally deport not count and those whom they can't? Well, the constitutional standard, as this court explained in Franklin, is usual residents. And the plain meaning of that term turns on whether or not someone commonly resides in the United States. It doesn't turn on their lawful immigration status. That term, usual residents, was defined at the founding as where a person commonly lives or sleeps. That's in both the Johnson and the Bailey dictionaries that we cite. And if you look at the dictionary that the government relies on, Webster's 1828, which they rely on for the definition of inhabitant, it defines residents as distinct from nationality, offering the example of the residence of an American in France or Italy for a year. So residents doesn't admit of exclusions on the basis of lawful immigration status. It turns on whether a person's physical presence is transient or not. Justice Alito. I'm going to try to see if I can get you to answer Justice Breyer's question. Last term, we had a case involving an alien, Mr. Ferris, say Jim, who crossed the border unlawfully and was almost immediately apprehended and then placed in detention. Would he have to be counted? Well, under the Bureau's current residence rules, he would. But I just would note that the court's holding in Thracian, you know, was about whether or not someone, you know, had entered for purposes. I understand that. So is it your position that every single person who is in every single alien who is in the United States on census day must be counted? I would say that every person who is an alien in the United States under on census day is subject to the same residence requirements as anyone else who is a person inside of a state. If a United States citizen is usually a resident abroad and is temporarily visiting the country on April 1st on census day to see family or something like that, that person's not counted in the census. You're saying that for each of these people, there has to be a very specific, a very fact specific determination about whether they, whether they are a resident or not. Is that administrable at all? Well, the rules that were administered by the federal marshals in the first census in 1790, Justice Alito were to ask whether or not a person usually resides at the dwelling that's being visited. If not, where do they actually usually reside? And if the person has no stable residence to count them simply where they're found on April 1st, that's been the practice since the founding. But I would agree. I just want to make clear. I would agree that there is discretion to make decisions on the basis of residence, but the plain language of the operative constitutional and statutory provisions don't turn on lawful immigration status. They turn on the facticity of a person's residential circumstance. Mr. Ho I'd like to follow up on the effect of waiting. In this case is, is the waiting problem that the, the census apportionment doesn't happen until April 1st. Is that correct? No, just to sort of my or the commerce secretary's report is due to the president on December 31st. And then the president must submit a report to Congress within seven days of the beginning of Congress's term. That's either on January 10th or 11th. And then the clerk of the house must within 15 days of that send certificates to each of the states, notifying them how many seats in in Congress, each state will get. So we're talking about the apportionment already begins. Once the report is issued. And so we would have to unscramble the egg. Now, can we go back to the, the question that seems to be at the nub of what many of my colleagues are asking about, which is can, and should we read rule that simply that not counting illegal aliens, because they're undocumented, but that is a violation of the statute and the constitution. Is that enough relief to you? I think it is just a set of my work because the policy that we're challenging is broad enough. We're bringing a facial challenge to it and the policy lacks a plainly legitimate sweep. The vast majority of undocumented immigrants qualify as usual residents under any plausible interpretation of that term. 66. I even agree with that. However, Good. Would that just mean, what does that mean? Practically does what does the secretary do? He doesn't send anything. How about if the president comes back and says, just send it to me on these categories. What happens with that? The injunction prohibits merely the inclusion of information to implement the existing presidential memorandum in the secretary's one 41 report for apportionment. It's not a gag order on the commerce secretary. There's nothing that would prohibit the commerce secretary from publishing various accounts of subcategories of undocumented immigrants on the internet. That's not something that's prohibited by the injunction. Justice Hagan. I guess I would like you to, to comment on, on general wall's view of the feasibility of the matching process. You know, whether you have any insight into that and to how the process works and, and maybe as part of that, whether you have any insight into the question of why it is that the government knows now that it can do that matching with respect to the ice detainees, but isn't sure it can do that matching with respect to categories of people for whom it has equally good administrative records. Well, just as Kagan, I'm not a social scientist, but here's what I know in July of 2019, the president issued an executive order on the collection of administrative records as they relate to citizenship with one of the goals being to ascertain the number of undocumented immigrants in each state. And the text of that memorandum states that the census Bureau at that time, this was in July of 2019. So about a year and a half ago, the census Bureau had determined based on experience that administrative records to which it already had access would enable it to determine citizenship status for approximately 90% of the population. So we know that the Bureau has a lot of experience with matching. It can do it for the vast majority of the population already. That's with administrative records maintained by the social security administration and other executive branch agencies. They've been collecting more records for the last year and a half. And as your honor noted, the government has information on millions of undocumented immigrants. I think when you add all of that together, that's at least a substantial risk of injury because it doesn't take much to change the apportionment as justice prior noted in his opinion last year in the citizenship question case, the difference of a few thousand people in a state can mean the difference between a gaining or losing a seat. Thank you, Mr. Justice Gorsuch. Thank you, chief. No questions. Justice Kavanaugh. Thank you, chief justice. And good morning, Mr. First, I want to make one point in response to something general Underwood said, and I'm hope, hoping the solicitor general can address this on reply about the declaratory judgment after apportionment, who that would be addressed to and how that would work. That's something that I would appreciate more from the solicitor general on, but not going to be able to ask at that point as to, as to you, I want to ask you about your point that we should rule now, because the memo expresses the intent to exclude non-citizens who are here on lawfully to the maximum extent under law is what you said. And you quoted that a couple of times. You also referenced, I think this is important. The memorandum says feasible and I think the argument is revealed as did the briefs, but the argument even more clearly, it's going to be very difficult. It's not going to be particularly feasible to exclude all of the non-citizens are going to be left with categories. How do we think about feasibility? Well, the government's identified three subcategories of undocumented immigrants, which in the last few pages of their reply brief. So I assume those are the ones that the government thinks are the most feasible, but each of those groups, I think is overbroad. Those groups are heterogeneous and to exclude any of them would violate constitutional and statutory commands. There's people detained at the border, but as I mentioned, a lot of people, but I'm sorry to interrupt, but could we, could we roll to that effect? Now we really haven't had briefing and argument on the particular subcategories. I'd agree with it to the extent the government wants to rely on saving this policy with respect, you know, by citing one or two purportedly valid subcategories to exclude, it would be better for this court to get full briefing on those categories, but there's nothing that stops this court from ruling on the facial validity of this policy because it plainly lacks a legitimate sweep. It applies. And then in litigation in January, we would deal with the subcategories. Is that how you foresee this? If that's what the president ultimately ends up doing and issues a new memorandum, I think that would be something that, you know, we'd have to deal with one way or another because the injunction in this case that was issued by the district court doesn't prohibit the exclusion of particular subcategories under a different memo than the blanket categorical one that's at issue in this case. Thank you. Justice Barrett. Mr. Ho, you, do you agree that there would be nothing wrong or there would be no legal prohibition against the president issuing a new memo, articulating a new basis for excluding subcategories? Well, the injunction in this case doesn't so preclude the president, Justice Barrett. I don't know if I would commit to there being nothing wrong or it being unlawful, not being unlawful. I think we would have to see what the memo does. If it excludes people on the basis of transient residents within the realm of the president's discretion of this court. Let me just clarify. I didn't, I didn't mean that the lawfulness of whatever the new memorandum said would be determined. I just meant that there would be nothing unlawful about his switching positions and articulating a new rationale for why certain categories of illegal aliens were excluded. In that hypothetical, Justice Barrett, it wouldn't just be a new rationale. It would be an entirely new policy with a different scope in addition to different reasoning. He could do that, right? The injunction in this case doesn't prohibit that. That's right. Now, whether or not that particular policy would be lawful, I think. It would be a different question. As you told Justice Kavanaugh, that would be a bridge we would have to cross later, right? Like if he said, listen, it's just not feasible. We haven't been able to get the information. So this is why we're going to exclude those in ice detention facilities. Say, well, if the reason we're simply feasibility, but the basis for exclusion were that they were undocumented and their lack of lawful status. And I think that would run into the same kind of reasoning that this court pointed to in Shelby County. But that, excuse me, Mr. Howie, but, but in that instance, you're saying that the policy itself would be unlawful, but you're not taking the position that he is precluded at this point from changing positions and issuing a new policy, the lawfulness of which would be a separate question. Yes, of course. That's right. Because the, the, the injunction below, you know, is specific to the policy that's been issued and it's a categorical nature. Thank you, Mr. A minute to wrap up, Mr. In closing your honors, no court, no Congress and no executive branch before now has ever thought that undocumented immigrants could be excluded from the whole number of persons in each state in 1868, the 14th amendment based apportionment on person, not the citizens specifically to embrace the entire immigrant population and to secure, to secure ratification by States with large immigrant populations. And in 1929, Congress mandated apportionment on total population, a plain meaning of which does not permit exclusions for immigration status. While the president may have some discretion in borderline cases, he does not have authority to erase millions of state residents from the apportionment based solely on unlawful immigration status. As the Latino justice amicus brief notes, undocumented immigrants contribute 1 trillion in GDP, 20 billion in federal taxes, 80% are essential workers. One in four are homeowners and pay property taxes. There are neighbors, our coworkers and our family members. They are usual residents under any plausible definition of that term. Thank you. Counsel rebuttal general wall. Thank you, Mr. Chief justice. So as I think Appleby's response is confirmed, there's no live or ripe case now. So they seem to accept that the court should just hold for a couple of weeks. But as you said, Mr. Chief justice, by the time we actually run the matching and have more information, the secretary will be ready to send his report. This is all going to happen on an extremely compressed timeline in January. And I don't think prudential ripeness should be used to await a right claim that could run out the clock on the president's opportunity to send a statement to Congress on the merits. If the president can consider immigration status for any subset, then the court needs to reverse the injunction below and take just three categories. Those in ice facilities, those who've committed crimes and are subject to final orders of removal. And those who have overstayed visas, the president could decide that it's consistent with his discretion. As the memo says to exclude those categories from the apportionment base. And the question then is, do they have an enduring tie under Franklin? They don't, they don't have a tie. We know that from Kaplan. And even if they do, it's not enduring because they can be removed. The other side's test, which they haven't spent a lot of time defending today is where you live or sleep most of the time, but that doesn't fit long-term embassy personnel, federal personnel overseas, even college and boarding school students are members of Congress. The test isn't just where you lay your head at night. It is as Franklin says, where you have allegiance or an enduring tie. And there's no coherent theory of political representation that says every illegal alien, no matter how little time they've been here, or no matter that they are imminently facing removal, there's a usual or settled resident. It's the sovereign's prerogative to define the political community as they are, as Siggian says. And the other side is left to say, look, this is just what the founders wanted, but they don't have an explanation for why the founders would have wanted it. And that should give us pause because whatever the founders were, they were not aimless people given to purposeless structures. The court should vacate or reverse the judgment and the other judgments in the other cases and allow the secretary to send his report. Finally, to you justice Kavanaugh, that would open up the possibility of post apportionment litigation in the event that there is an effect on apportionment or funding. And if appellees prevail in that litigation on the basis of whatever categories are excluded, and they then bring as applied challenges, they would be asking for the same relief as in Franklin. They'd be asking for a declaratory judgment against the secretary of commerce to reform his section one 41 report. It would not be a declaratory judgment against the president. Franklin doesn't allow that, but Utah tells us that we assume that the president will comply with that reason to form a different assumption here. The president would comply with the post apportionment judgment in the event that litigation ever happens. Again, we think there is a real prospect that it will not, but if it does, there is time enough for that to happen when you have concrete injuries and you have a definitive decision from the president on which groups will be excluded from the apportionment base. We asked if the court vacate or reverse the judgment here and the judgments in the parallel cases. Thank you, general. The case is submitted.